IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Susan Tallmage, | ) | C/A No.: 1:13-2035-TLW-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.     Relevant Background

A.     Procedural History

On January 10, 2011, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on January 19, 2004. Tr. at 62. Her applications were denied initially and upon reconsideration. Tr. at 71–74, 75–78, 85–86, 87–88. On April 17,

2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Thomas G. Henderson. Tr. at 33–48 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 8, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 10–25. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 25, 2013. [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 44 years old at the time of the hearing. Tr. at 23. She obtained a high school equivalency certificate. *Id.* Her past relevant work ("PRW") was as a cashier. *Id.* She alleges she has been unable to work since January 19, 2004. Tr. at 15.

2.    Medical History

Plaintiff was hospitalized and initially diagnosed with schizoaffective disorder and psychotic disorder, not otherwise specified ("NOS") in January 2004. Tr. at 639, 643. She was subsequently diagnosed with bipolar disorder in February 2004. Tr. at 648. Mental health treatment notes from 2004 indicate that Plaintiff was doing well; was sleeping well; was not hallucinating; and that her mood was pleasant and euthymic. Tr. at 648, 650, 651, 652, 653, 654, 656.

In January 2005, Plaintiff presented to Coastal Empire Mental Health to report that she had not slept in four days and that she was experiencing other manic symptoms. Tr. at 657. Plaintiff's medications were adjusted. Tr. at 657.

2

Plaintiff noted improvement at her visit on February 14, 2005. Tr. at 660. She continued to report stable mood, sleeping well, and no symptoms of mania throughout most of 2005. Tr. at 661, 662, 664, 665, 666, 668. However, on November 17, 2005, Plaintiff again reported that she had not slept in a week, that she had racing thoughts, and that she was irritable and snappy. Tr. at 669.

Plaintiff visited Coastal Empire Mental Health on twelve occasions between January 5, 2006, and September 11, 2008. Tr. at 257–69. She consistently reported sleeping fine, having no manic symptoms, hearing no voices, and experiencing no paranoia. *Id.* During all visits, Judith L. Treadway, M.D., indicated that Plaintiff's mental status was pleasant, euthymic, and without psychosis. *Id.*

On December 11, 2008, Plaintiff indicated that she was not sleeping as well, but that she was getting at least six hours of sleep. Tr. at 256. Plaintiff denied paranoia, hearing voices, and seeing visions. *Id.* Dr. Treadway indicated that Plaintiff was doing fairly well. *Id.*

On March 9, 2009, Plaintiff indicated to Dr. Treadway that she was doing well, sleeping well, hearing no voices, and having no problems with medications. Tr. at 255.

Plaintiff followed up with Dr. Treadway on June 8, 2009, and reported no problems. Tr. at 295. Plaintiff's mental status was alert and oriented and euthymic, and her insight and judgment were noted to be good. *Id.* Dr. Treadway assessed a Global Assessment of Functioning ("GAF")[1] score of 80. Tr. at 296.

---

[1] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. The GAF scale provides 10-point

On August 31, 2009, Plaintiff reported doing well and having no problems with symptoms or side effects.  Tr. at 297.  Dr. Treadway assessed a GAF score of 70.  Tr. at 298.

Plaintiff reported to Dr. Treadway that she was doing well and having no problems of December 14, 2009.  Tr. at 299.  Dr. Treadway assessed a GAF score of 70.  Tr. at 300.

On April 26, 2010, Plaintiff reported to Dr. Treadway that she was experiencing increased sadness following the death of her uncle.  Tr. at 301.  Plaintiff reported recently feeling down and tired.  *Id.*  Her mental status examination was normal.  *Id.*  Dr. Treadway assessed a GAF score of 65.  Tr. at 302.

On August 23, 2010, Plaintiff indicated to Dr. Treadway that her mood was good and her sleep was stable.  Tr. at 303.  She denied problems with voices, visions, or paranoia.  *Id.*  Plaintiff's mental status evaluation was normal.  *Id.*  Dr. Treadway assessed a GAF score of 65.  Tr. at 304.

Plaintiff presented to the emergency room at Lowcountry Urgent Care on January 7, 2011, with complaint of headache, vomiting, and light-sensitivity.  Tr. at 312.  She was diagnosed with a migraine headache.  Tr. at 313.

---

ranges of assessment based on symptom severity and level of functioning.  If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two.  Diagnostic & Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) (2000).

Plaintiff presented to the emergency department at Beaufort Memorial Hospital on January 8, 2011, with complaint of headache. Tr. at 320. A meningioma was discovered on imaging reports. Tr. at 324.

Plaintiff followed up with her family physician Daniel C. Ripley, M.D., on January 11, 2011, and requested a referral to a neurologist. Tr. at 329. She complained of recent headache. *Id.*

Plaintiff consulted with neurosurgeon William Alex Vandergrift, M.D., on January 26, 2011. Tr. at 356–57. Plaintiff reported to Dr. Vandergrift that she had been having constant left-sided headaches for the last two weeks. Tr. at 356. Dr. Vandergrift indicated that the MRI report showed a weakly homogeneous enhancing left frontal calvarial-based lesion with some focal underlying mass effect on the brain tissue, but no surrounding edema. Tr. at 357. Dr. Vandergrift indicated that Plaintiff had a small meningioma, but that it was not likely responsible for her symptoms. *Id.*

Plaintiff followed up with Dr. Treadway on February 8, 2011, complaining of recent stress from diagnosis of benign brain tumor and boyfriend's illness. Tr. at 375. Plaintiff reported having problems with sleep, and Dr. Treadway observed that she was stressed and anxious. *Id.* Plaintiff's mental status examination was normal. Dr. Treadway assessed a GAF score of 55. Tr. at 376.

On March 1, 2011, state agency medical consultant Cleve Hutson, M.D., completed a physical residual functional capacity assessment. Tr. at 382–89. He concluded that Plaintiff had no established exertional limitations, postural limitations,

manipulative limitations, visual limitations, communicative limitations, or environmental limitations.  Tr. at 383–86.

On March 7, 2011, Lisa Clausen, Ph.D., completed a psychiatric review technique for the then-current period in which she indicated that Plaintiff had bipolar disorder and a history of cannabis abuse, in full remission.  Tr. at 393, 398.  Dr. Clausen concluded that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 400.  Dr. Clausen concluded that there was insufficient evidence to support a medical determination regarding Plaintiff's psychiatric functioning for the period from January 19, 2004, to the Plaintiff's date last insured.  Tr. at 404.  Dr. Clausen also completed a mental residual functional capacity assessment, in which she concluded that Plaintiff was moderately limited with respect to the following:  the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to interact appropriately with the general public.  Tr. at 418–19.  Dr. Clausen concluded that Plaintiff was not significantly limited with respect to all other mental activities.  *Id.*

On March 9, 2011, Plaintiff presented to Dr. Downs for an initial visit.  Tr. at 424.  She reported recent depression after her partner of 11 years died unexpectedly.  *Id.*  She reported difficulty sleeping, nausea, and frontal and occipital headaches.  *Id.*

Plaintiff presented to Sandra McDaniel, R.N., at Coastal Empire Mental Health on April 4, 2011. Tr. at 710. Plaintiff denied all symptoms. *Id.* Nurse McDaniel noted that Plaintiff was neat, appropriately dressed, and dealing well with her grief. Tr. at 711.

Plaintiff presented to Beaufort Memorial Hospital on May 2, 2011, complaining of pain in the back of her head. Tr. at 514. Plaintiff was diagnosed with a migraine headache. Tr. at 519.

Plaintiff attended a consultative examination with Cashton Spivey, Ph.D., on June 2, 2011. Tr. at 434–36. Plaintiff reported depression secondary to having a brain tumor and the recent death of a friend. Tr. at 432. Plaintiff also complained of sleep disturbance, fluctuating appetite, low energy level, attention/concentration problems, and crying spells. *Id.* She denied suicidal or homicidal ideation and paranoid thinking. *Id.* She denied halluciations. *Id.* Plaintiff scored 27 of 30 on the Mini-Mental State Examination ("MMSE"), which fell within normal limits. *Id.* She was unable to perform serial 7s or to spell "world" backwards. *Id.* She was able to recall one of three objects at five minutes. *Id.* She demonstrated intact language skills, followed a three-step command, and reproduced a drawing. *Id.* Her general fund of information and abstract reasoning abilities were fair. Tr. at 435–36. Her insight and judgment were fair. Tr. at 436. Her general intelligence score was estimated in the low average to average range. *Id.* Plaintiff's mood was flat, and her affect ranged from blunted to flat. *Id.* Her thought processes were logical and coherent and her attention/concentration was fair. *Id.* Her speech was mildly slowed, and she demonstrated mild psychomotor retardation. *Id.* Dr. Spivey indicated that Plaintiff "may display mild short-term auditory memory

difficulties." *Id.*    He diagnosed bipolar disorder, anxiety disorder, and cocaine dependence in remission. *Id.* Dr. Spivey assessed a GAF score of 50 (current) and 60 (past 12 months). *Id.* He further indicated that Plaintiff may have difficulty managing funds independently and accurately. *Id.*

Plaintiff followed up with Dr. Treadway on June 7, 2011. Tr. at 713–15. Plaintiff reported experiencing feelings of grief, but she denied depression. Tr. at 713. Plaintiff complained of decreased sleep. *Id.* Dr. Treadway assessed a GAF score of 55. Tr. at 714.

On June 14, 2011, Kathleen Broughan, Ph.D., completed a psychiatric review technique in which she indicated that Plaintiff had meningiomatosis; bipolar disorder-depressed; and cannabis, alcohol, and cocaine abuse, in full remission. Tr. at 437–50. Dr. Broughan concluded that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 447. Dr. Broughan also completed a mental residual functional capacity assessment, in which she indicated that Plaintiff was moderately limited with respect to the following: the ability to understand and remember detailed instructions; the ability to carry out very short and simple instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to interact appropriately with the general public. Tr. at 451–52. Dr. Broughan also noted that Plaintiff was able to

understand, remember, and carry out simple instructions; work with others and accept supervisory criticism; and recognize workplace hazards and take appropriate precautions. Tr. at 453. However, Dr. Broughan also indicated that Plaintiff would have difficulty understanding and remembering detailed instructions and sustaining attention over long periods of time. *Id.* She indicated that Plaintiff would likely miss occasional work days due to psychological symptoms. *Id.*

On August 15, 2011, Plaintiff presented to Nurse McDaniel with complaints of decreased appetite, irritability, and sleep disturbance. Tr. at 717. Nurse McDaniel assessed a GAF score of 65. *Id.* Plaintiff reported being very tired after babysitting for five children the week before and her affect was blunted. Tr. at 718.

Plaintiff was hospitalized a Beaufort Memorial from August 17, 2011, to August 23, 2011, for deep venous thrombosis of the left lower extremity. Tr. at 470. She was released with instructions to continue taking Coumadin. *Id.* Plaintiff's migraine headaches were noted to be stable. Tr. at 479. MRI on August 22, 2011, indicated no change in to the meningioma. Tr. at 495.

Plaintiff presented to Dr. Gray on August 21, 2011, complaining of swelling in her legs and vomiting. Tr. at 544. Plaintiff indicated that she experienced migraine headaches three to four times per month, and that Imitrex helped. *Id.*

On September 12, 2011, Plaintiff followed up with Dr. Ripley for prescription refills. Tr. at 549. She reported that she had occasional headaches that were controlled with Topamax. *Id.*

Plaintiff presented to Dr. Ripley for weekly monitoring of anticoagulant effectiveness from September 2011 through January 2012.  Tr. at 551–574.

On October 13, 2011, Plaintiff followed up with Dr. Treadway and denied symptoms of depression and anxiety.  Tr. at 722–23.

Plaintiff presented to Dr. Treadway on December 6, 2011, and indicated that she was sleeping fine, doing well, and exercising regularly.  Tr. at 725.  Her mental status examination was normal.  Tr. at 725–26.  Dr. Treadway assessed a GAF score of 60.

Plaintiff complained of a migraine to Dr. Ripley on January 11, 2012, when she presented for an anticoagulation monitoring appointment.  Tr. at 571.

On February 24, 2012, Plaintiff complained of a recent increase in migraines over the last several months.  Tr. at 575.  She indicated that Imitrex did not seem to be working as well.  *Id.*

On March 5, 2012, Plaintiff followed up with Nurse McDaniel with a sad affect.  Tr. at 727–28.  Plaintiff complained of migraine headache.  Tr. at 728.  Nurse McDaniel assessed a GAF score of 62.  *Id.*

On March 22, 2012, Dr. Ripley completed a medical source statement in which he indicated that he had treated Plaintiff regularly since August 24, 2005, and that she had diagnoses including migraine headaches, bipolar disorder, deep venous thrombosis, and allergic rhinitis.  Tr. at 627.  Dr. Ripley indicated that Plaintiff had severe migraine headaches that prevented all activity.  *Id.*  He indicated that Plaintiff's migraines were accompanied by nausea, vomiting, phonophobia, photophobia, throbbing pain, inability to concentrate, visual disturbances, and that they caused avoidance of activity.  *Id.*  Dr.

10

Ripley indicated that Plaintiff had three headaches per week that lasted from two to six hours. *Id.* He indicated that anxiety/tension, history of head injury, and primary migraines could reasonably be expected to explain Plaintiff's headaches. Tr. at 628. He noted that Plaintiff's headaches were triggered by bright lights, lack of sleep, stress, and strong odors. *Id.* He indicated that Plaintiff's headaches were worsened by bright lights, moving around, and noise. *Id.* Dr. Ripley indicated that Plaintiff's headaches became better with lying down, taking medication, being in a quiet place, and being in a dark room. *Id.* He indicated that Plaintiff was incapable of even "low stress" work. *Id.* Dr. Ripley noted that Plaintiff experienced side effects of medications including sleepiness, fatigue, and decreased concentration and mental acuity. Tr. at 629. He indicated that Plaintiff's impairments had lasted or could be expected to last at least twelve months. *Id.* He indicated that Plaintiff would be precluded from performing even basic work activities and would need a break from the workplace when she had a headache. *Id.* Dr. Ripley indicated that Plaintiff would be off task for 25% or more of the workday and that she would likely miss work on more than four days per month. *Id.*

Plaintiff was assessed by Dr. Treadway on April 5, 2012, and reported that she was not doing well and that she had felt manic for one to two weeks. Tr. at 729. Plaintiff's mental status examination was normal except for Dr. Treadway's indication of "mixed manic state." Dr. Treadway assessed a GAF score of 50. Tr. at 730.

On April 6, 2012, Dr. Treadway completed a questionnaire in which she indicated that Plaintiff was diagnosed with bipolar disorder-mixed moderate. Tr. at 733. She indicated that Plaintiff had a depressed syndrome characterized by depressed or irritable

11

mood, sleep disturbance, and psychomotor agitation or retardation. *Id.* She also indicated that Plaintiff had flight of ideas, racing thoughts, and decreased need for sleep. Tr. at 734. She noted that Plaintiff had a bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. *Id.* She indicated that Plaintiff had a history of a chronic affective disorder of at least two years' duration that had caused more than a minimal limitation of ability to do basic work activities, but with symptoms or signs currently attenuated by medication or psychosocial support. *Id.* Dr. Treadway indicated that Plaintiff had a residual disease process that has resulted in such marginal adjustment that even a minimal decrease in mental demands of change in the environment would be predicted to cause the individual to decompensate. Tr. at 735. Dr. Treadway indicated that Plaintiff was moderately limited with respect to the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and the ability to interact appropriately with the general public. Tr. at 736–37. Dr. Treadway indicated that Plaintiff was not significantly limited with respect to all other functional abilities that she assessed. *Id.* Dr. Treadway noted that her assessment applied to Plaintiff's current status on medication, but that severe stressors had led to a recent increase in symptoms. Tr. at 737. Dr. Treadway further noted "I do not feel she would be capable of sustained gainful employment without risking her decompensation." Tr. at 738.

Dr. Ripley signed a statement on June 23, 2012, in which he indicated that it was still his opinion that Plaintiff was disabled and could not work due to her condition.  Tr. at 740.

On June 25, 2012, Dr. Treadway signed a statement in which she indicated that it was her opinion that Plaintiff was disabled and could not work due to her condition.  Tr. at 741.  She further noted that Plaintiff had stopped taking Depakote and that her racing thoughts had subsided.  *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on April 17, 2012, Plaintiff testified that she had not worked since at least 2005.  Tr. at 35–36.  Plaintiff indicated that she lived alone and that she spent her days taking care of her personal needs and engaging in light house cleaning.  Tr. at 36. Plaintiff testified that she last used street drugs approximately four to five years earlier. Tr. at 37.  Plaintiff indicated that she had performed some light house cleaning jobs in order to pay her electric bill.  *Id.*  The ALJ asked Plaintiff about a note indicating that she had retired from babysitting five children.  Tr. at 38.  Plaintiff denied having worked as a babysitter for pay.  *Id.*

Plaintiff testified that she walked for approximately 30 minutes daily.  *Id.*  She indicated that she could ride in a car for an hour to an hour-and-a-half.  *Id.*

Plaintiff testified that she was unable to work because of bipolar disorder.  *Id.*  She indicated that her moods went up and down; that she had manic episodes; and that she

had depressive episodes, during which she spent the day in bed.  *Id.*  Plaintiff testified that she had problems getting along with employers and fellow employees.  *Id.*  She indicated that she had problems with concentration, following directions, making decisions, and completing tasks.  Tr. at 39.  Plaintiff testified that she had problems keeping jobs and that she had worked in approximately 20 jobs over a 15-year period.  *Id.*

Plaintiff testified that she had three to four migraine headaches per week.  Tr. at 40.  She indicated that she experienced vomiting and noise intolerance when she had migraines.  *Id.*  She indicated that the medication she took for migraines made her go to sleep for two to six hours.  *Id.*  She testified that her migraines were caused by a tumor.  *Id.*

Plaintiff testified that her other medications made her drowsy and that Depakote made her feel zoned out.  *Id.*

Plaintiff testified that she could sit for three to four hours at a time.  Tr. at 41.

Plaintiff testified that her mother helped her with yard work and other chores she could not perform.  Tr. at 42.  She indicated that she attended church, but did not engage in other social activities.  *Id.*  Plaintiff testified that her mother helped her to complete paperwork and to handle money.  Tr. at 43.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Coraetta Harrelson reviewed the record and testified at the hearing.  Tr. at 44–47.  The VE categorized Plaintiff's PRW as a cashier II, Dictionary of Occupational Titles ("DOT") number 211.462-010, which was light with a SVP of 2.  Tr. at 45.  The ALJ described a hypothetical individual of Plaintiff's

14

vocational profile who could perform light work with a sit-stand option; would be limited to simple, repetitive, routine work; could have no ongoing interaction with the general public; and could have only occasional interaction with coworkers and supervisors. *Id.* The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* However, the VE identified jobs that could be performed with those limitations, including sorters, DOT number 529.687-186, which are light with a SVP of 2, with 800 jobs in the state economy and 50,000 jobs in the national economy; garment tag stringers, DOT number 794.687-054, which are light with a SVP of 1, with 2,000 jobs in the state economy and 299,000 jobs in the national economy; and ticket markers, DOT number 209.587-034, which are light with a SVP of 2, with 20,000 jobs in the state economy and 1,500,000 jobs in the national economy. Tr. at 46. The ALJ asked the VE to assume that the hypothetical individual would have difficulties with concentration for one to two hours during the workday and asked what effect that would have on the jobs identified. *Id.* The VE indicated that an individual with those limitations would not be able to perform outside of a structured environment or a part-time level job, and would have difficulty maintaining full-time employment. Tr. at 46–47. The ALJ asked the VE what the customary tolerance was for absences in the industry. Tr. at 47. The VE responded that anything outside of five sick days and five vacation days per year would not be tolerated. *Id.*

Plaintiff's attorney declined to question the VE.

2. The ALJ's Findings

In his decision dated May 8, 2012, the ALJ made the following findings of fact

and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2007.

2. The claimant has not engaged in substantial gainful activity since January 19, 2004, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: status post deep vein thrombosis of the left lower extremity; headaches; status post substance abuse (in remission); and bipolar disorder (20 C.F.R. 404.1520(c) and 416.920(c).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). Specifically, the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours each in an 8-hour work day. She requires an opportunity to sit/stand. The claimant is limited to simple, routine, repetitive tasks. Additionally, she must not have any ongoing interaction with the general public and only occasional interaction with co-workers and supervisors.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7. The claimant was born on April 3, 1968 and was 35 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social
Security Act, from January 19, 2004, through the date of this decision (20
CFR 416.920(g)).

Tr. at 15–25.

II.    Discussion

Plaintiff alleges the Commissioner erred because the ALJ applied incorrect legal standards in evaluating the opinions of Plaintiff's treating physicians.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged

in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-

---

[2]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii).  To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3]  In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

62 (1982).  The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

Plaintiff argues that the ALJ failed to assess the opinions of Drs. Ripley and Treadway based on the criteria set forth in 20 C.F.R. § 404.1527(c) and SSR 96-2p. [Entry #14 at 5].  Plaintiff is not specifically arguing that the opinions of Drs. Ripley and Treadway should have been accorded controlling weight, but is instead arguing that the ALJ failed to consider all of the relevant factors in determining the weight to which their opinions were entitled.  [Entry #16 at 3].  The Commissioner argues SSR 96-2p requires only that the ALJ's decision contain "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record," and "be specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  [Entry #15 at 7].  The

Commissioner also argues that the ALJ permissibly relied on the fact that the opinions were not consistent with the record as a whole when declining to assign controlling weight to them.  [Entry #15 at 9].

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record).  However, "the rule does not require that the testimony be given controlling weight."  *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).  The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence."  *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001).

20 C.F.R. §§ 404.1527(c) and 416.927(c) provide that, if a treating source's opinion is not accorded controlling weight, the ALJ should consider "all of the following factors" in order to determine the weight to be accorded to the medical opinion: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination, nature and extent of treatment relationship, and supportability; consistency with the record as a whole, specialization of the medical source; and other factors.  *See also Johnson*, 434 F.3d at 654.

Social Security Ruling 96-2p specifically states:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.

The ALJ's decision must explain the weight accorded to all opinion evidence. 20 C.F.R. §§ 404.1527(e)(2)(ii) and 416.927(e)(2)(ii). In all unfavorable and partially favorable decisions and in fully favorable decisions based in part on treating sources' opinions, the ALJ must include the following:

> [T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight.

SSR 96-2p.

In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

The ALJ specifically stated the following regarding Dr. Ripley's opinion:

> I have considered the March 2012 opinion of Dan Ripley, M.D., that the claimant is incapable of even "low stress" work. He noted that the claimant would be precluded from performing even basic work activities when she has a headache and she would need a break from the workplace. Dr. Ripley estimated that the claimant would be off task for 25% of the work day due

to the severity of her symptoms.  (Exhibit 27).  I accord this opinion little weight, as treatment notes from 2011 showed that the claimant's headaches were controlled with Topamax.  (Exhibit 26F).  Furthermore, I accounted for the claimant's headache symptoms in the residual functional capacity by limiting the claimant to simple, routine, repetitive tasks.

Tr. at 22.

The ALJ also specifically addressed Dr. Treadway's opinion as follows:

Consideration has also been given to the April 2012 opinion of Judith L. Treadway, M.D.[,] that the claimant would not be capable of sustained gainful employment without the risk of decompensation due to significant stressors from her children and the death of her partner.  She also noted that the claimant was moderately limited in her ability to: complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public.  Dr. Treadway further noted that her opinion was based on the claimant's current condition.  (Exhibit 30F).  I accord this opinion little weight, as the record shows that the claimant's partner passed away over one year ago and subsequent treatment notes showed the claimant only exhibited normal feelings of grief. (Exhibits 15F and 29F).  Furthermore, I noted that the claimant's child only recently moved out of the claimant's house and the claimant's GAF scores have consistently ranged between 55–65 in 2011 when her child was present in the home.  (Exhibits 19F and 29F).  Such evidence does not support Dr. Treadway's opinion.

Tr. at 23.

The undersigned recommends a finding that, while the ALJ must address in the decision the enumerated factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) when considering opinion evidence, the ALJ is not required to address those factors specifically when discussing the opinions at issue.  If the notice of the decision makes clear the weight accorded to the treating physicians' opinions, provides specific reasons for the weight given, is supported by the evidence in the case record, and addresses the factors set forth in §§ 404.1527(c) and 416.927(c), the ALJ has properly assessed the

opinion evidence. The decision should be viewed as a whole in order to determine whether these requirements have been met and whether substantial evidence supports the ALJ's decision.

The undersigned recommends a finding that the ALJ complied with the requirements of 20 C.F.R. §§ 404.1527(c) and 416.927(c) in assessing Dr. Ripley's opinion. While the ALJ only discussed the consistency of Dr. Ripley's opinion with the record as a whole when specifically explaining why he gave it "little weight," he addressed all of the factors set forth in §§ 404.1527(c) and 416.927(c) in other parts of his decision. The ALJ specifically considered the "examining relationship" criterion when he acknowledged that Plaintiff received treatment from Dr. Ripley. Tr. at 19. The ALJ discussed treatment notes from Dr. Ripley over a period of several years, which satisfied the "treatment relationship" criterion. Tr. at 20–21. The ALJ also discussed records from Plaintiff's emergency room visits for migraines, CT and MRI reports, and the consultation with Dr. Vandergrift, which indicates that he considered the consistency of Dr. Ripley's opinion with the record as a whole. Tr. at 20. The requirement to consider specialization was negated by the fact that Dr. Ripley was Plaintiff's family physician and did not practice any form of specialized medicine.

The undersigned also recommends a finding that the ALJ complied with the requirements of 20 C.F.R. §§ 404.1527(c) and 416.927(c) in assessing Dr. Treadway's opinion. While the ALJ addressed only the treatment relationship factor when indicating that he gave Dr. Treadway's opinion "little weight," the ALJ addressed the other factors in other parts of his decision. The ALJ noted that Plaintiff received mental health

treatment from Dr. Treadway, which addressed the "examining relationship" and "specialization" criteria. Tr. at 18. The ALJ's noted specific periods of treatment and findings that pertained to the treatment relationship, including symptoms, observations and GAF scores indicated by Dr. Treadway. Tr. at 19–20. The ALJ found that "the claimant's bipolar disorder was relatively stable throughout the record." Tr. at 21. He further noted "[t]reatment notes showed that her symptoms were well controlled with Abilify and Cogentin for years, and the recent addition of Depakote added further control." *Id.* Finally, he stated "[t[his finding was evidenced by GAF scores of 55–80 and relatively normal mental status examinations throughout the record." *Id.* The ALJ also discussed Plaintiff's mental impairment as reflected in the record as a whole, including discussion of Plaintiff's January 2004 hospitalization, the June 2011 consultative examination, and the longitudinal records from Coastal Empire Mental Health Center. Tr. at 19–20.

The undersigned recommends a finding that the ALJ's decision to accord little weight to the opinions of Drs. Ripley and Treadway was supported by substantial evidence and that the ALJ correctly applied the legal standards set forth for weighing opinion evidence in 20 C.F.R. §§ 404.1527(c) and 416.927(c) and SSR 96-7p.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

August 20, 2014                              Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).